```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DARREN PATRICK SICKLER,            :    14 Civ. 1411 (JCF)
                                   :
                Plaintiff,         :        MEMORANDUM
                                   :        AND ORDER
     - against -                   :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of Social      :
Security,                          :
                                   :
                Defendant.         :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

The plaintiff, Darren Patrick Sickler, brings this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a determination of the Commissioner of Social Security (the "Commissioner") finding that he is not entitled to disability insurance benefits.  The parties have submitted cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the plaintiff's motion is granted, the Commissioner's decision is reversed, and the case is remanded to the Social Security Administration for further findings with respect to the period for which the plaintiff is entitled to benefits.[1]

---

[1] The parties have consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal

Background

    A. Personal History

    Mr. Sickler was born on April 8, 1960.  (R. at 34).[2]  The record indicates that he has some college education.  (R. at 36).  The plaintiff's last job was as a gas line surveyor. (R. at 37-40, 195); prior to working as a surveyor, he was a glass installer  (R. at 41, 195).  He lost his most recent job in December 2008 when his employer's contract in South Carolina was not renewed.  (R. at 40).  As of August 8, 2012, Mr. Sickler lived in an apartment in New Rochelle, New York with his girlfriend and daughter.  (R. at 33).

    B. Medical History

    The plaintiff alleges a disability beginning July 1, 2010 (R. at 14), consisting of back and neck pain and numbness in his left leg.  (R. at 66, 90).  A June 2005 visit to the South Shore Medical Center emergency department and a June 24, 2010, walk-in visit to Conway Medical Center are the only medical reports on record preceding the plaintiff's alleged onset date.  (R. at 277, 472-74).  The 2005 visit appears to have been precipitated by an attack of gout (R. at 472-73), while the reason for the 2010 walk-in was an abscess on Mr. Sickler's elbow.  (R. at 277).  Upon examination in

---

Rules of Civil Procedure.

    [2] "R." refers to the Administrative Record.

2010, Mr. Sickler was found to have "grossly normal" extremities with intact range of motion and sensation. (R. at 277). He was discharged shortly thereafter with prescriptions for Keflex and Bactrim. (R. at 279).

On August 25, 2010, the plaintiff met with Dr. Elliott Bettman at the Conway Medical Center complaining of neck and back pain. (R. at 293). Mr. Sickler tested "moderately positive" for straight leg raising. (R. at 293). Dr. Bettman scheduled the plaintiff for MRIs of the cervical and lumbar spine and prescribed Ultram. (R. at 293). The plaintiff underwent the prescribed MRI examinations on September 3, 2010. (R. at 283, 285, 295-96). The cervical spine MRI showed "[m]ultilevel multicolumn degenerative changes" and "left uncovertebral osteophyte and disk complex creating high-grade left and mild to moderate right exiting foraminal stenosis." (R. at 284, 298). The most pronounced abnormality appeared at C5-C6 which showed "[h]igh-grade left exiting foraminal stenosis with moderate right." (R. at 283, 284, 298). The lumbar spine MRI revealed a "L4-L5 broad-based bulge with central and left disk protrusion. This contacts both forming L5 nerve rootlets, displacing the one on the left. Facet hypertrophy contributes to right greater than left exiting foraminal stenosis." (R. at 296).

On October 8, 2010, the plaintiff returned to Conway Medical

Center for a follow-up. (R. at 290). Dr. Bettman assessed the MRI of the back as "abnormal" and noted Mr. Sickler's continued complaints of pain. (R. at 290). Mr. Sickler was also diagnosed with gout. (R. at 290). He was discharged with prescriptions for Lorcet, Pravachol, and Benemid. (R. at 290).

Three days later, the plaintiff underwent an orthopedic examination with Dr. Regina Roman, D.O. (R. at 303). Mr. Sickler reported "chronic low back pain, which radiates to his left leg," numbness and tingling, and "shooting pain to his left foot." (R. at 306). He also complained of left shoulder pain that sometimes radiates to his arm and "involuntary movements of the fingers of the left hand." (R. at 307). The plaintiff stated that he was unable to walk more than half a block before having to rest because of his low back and foot pain. (R. at 307). He further admitted needing assistance in getting his socks and shoes on and stated that his "wife"[3] did the cooking, cleaning, and shopping. (R. at 308). During the physical examination, the plaintiff was observed to have a "slow and antalgic" gait during which he favored his left leg, though he did not utilize an assistive device. (R. at 308). Mr. Sickler was able to get on and off the examination table,

---

[3] Mr. Sickler was not married as of August 2012 and was apparently referring to his girlfriend. (R. at 33).

utilize a logrolling technique to go from supine to seated, and perform a squat to 50 degree knee flexion while holding the examination table. (R. at 308-09). The plaintiff also underwent range of motion testing and exhibited full cervical spine flexion and extension, though he complained of discomfort with right and left rotation. (R. at 309). Lumbar spine flexion was 70 degrees, with increased discomfort with right lateral flexion and forward flexion. (R. at 309). Straight leg testing was negative bilaterally, but positive unilaterally at 40 degrees on the right side and 30 degrees on the left for low back pain. (R. at 309). Mr. Sickler had full range of motion in his fingers and the ability to manipulate small items. (R. at 309). No muscle atrophy was noted, but Mr. Sickler was unable to heel, toe, or tandem walk due to lower back pain. (R. at 309).

On November 2, 2010, Dr. Jim Liao, a Medical Consultant for the Social Security Administration, reviewed the plaintiff's medical files, but did not examine Mr. Sickler personally. (R. at 314). Dr. Liao recorded his findings in a Physical Residual Functional Capacity Assessment. (R. at 314). He concluded that the Mr. Sickler could "[o]ccasionally lift/or carry" 20 pounds, "[f]requently lift and/or carry" ten pounds, and was "unlimited" in his ability to "[p]ush and/or pull". (R. at 315). Dr. Liao also

found that Mr. Sickler could stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday and sit (with normal breaks) for a total of about six hours in an eight hour workday. (R. at 315).

Dr. Liao also found the plaintiff's "[a]lleged chronic back pain and lt pain" to be credible. (R. at 316). The report noted Mr. Sickler's foraminal stenosis and "lt radiculopathy" in the comments section. (R. at 316).

From early February 2011 to April 2011, the plaintiff frequently visited the Family Practice of Kingston, often with the same complaints. On February 11, 2011, the plaintiff sought care for lower back pain and poor circulation in his legs. (R. at 388). Mr. Sickler reported left-side weakness, numbness, tingling, and involuntary movements in both upper and lower extremities. (R. at 390). The supervising physician, Dr. Raymond Harvey, noted Mr. Sickler's antalgic gait, pain while in motion, and lumbar stenosis. (R. at 391). A week later the plaintiff was seen by Dr. Geniene Wilson. (R. at 383). Dr. Wilson scheduled Mr. Sickler for an MRI. (R. at 386). On February 25, 2011, the plaintiff again sought relief for his chronic back pain. (R. at 376). Mr. Sickler's pain medication prescription was renewed and a consultation with a neurosurgeon was scheduled. (R. at 379).

On February 26, 2011, the plaintiff underwent an MRI on his lumbar spine. (R. at 393). The MRI revealed "[s]uperimposed L3-4 and L4-5 disc herniations" with stenosis being most severe at those levels. (R. at 394). It further showed Mr. Sickler's "Cauda Equina is bunched together . . . at L3-4 and L4-5";[4] narrowing and signal loss at L1-2, L2-3, and L4-5; and central and/or foraminal stenosis ranging in severity from mild to severe at L1-2, L2-3, L3-4, L4-5, and L5-S1. (R. at 393-94).

On March 15, 2011, the plaintiff saw Dr. Wilson, again reporting back pain and stating that his medication was losing effectiveness. (R. at 371). Mr. Sickler also reported that sometimes his "leg gives out on him". (R. at 373). He was scheduled for a neurology appointment and prescribed Fentanyl patches to help his back pain. (R. at 374). The plaintiff returned two weeks later on March 29, 2011, for his back pain. (R. at 366). During the physical examination, Mr. Sickler tested positive on a bilateral straight leg test. (R. at 369). On April 21, 2011, the plaintiff returned to Dr. Wilson, stating that his back pain "[h]urts [w]orse". (R. at 361). Dr. Wilson diagnosed

_____

[4] The cauda equina is the grouping of nerve roots at the end of the spinal cord. Head and Spine Trauma: Specialties, Stanford School of Medicine, available at http://neurosurgery.stanford.edu/patient_care/head_spine.html (last visited March 2, 2015).

Mr. Sickler with neuropathy.[5]  (R. at 364).

On June 3, 2011, the plaintiff attended a consultation with Dr. Farag Aboelsaad for a possible transforaminal epidural injection.[6]  (R. at 342).  Mr. Sickler described his pain as being "located in the lower back, more in the left than the right. It is also going down more in the left lower extremity than in the right lower extremity . . . [with] numbness in the left lower extremity". (R. at 342).  Mr. Sickler also stated that his pain increases with activity.  (R. at 342).  Dr. Aboelsaad noted that the plaintiff displayed a very slow gait, inability to walk on heels or toes, and "sensation diminished in the left lower extremity more than the right to light touch."  (R. at 343).  A transforaminal epidural steroid injection was scheduled thereafter to help with Mr. Sickler's back pain.  (R. at 343).

On June 10, 2011, the plaintiff underwent an MRI of his

---

[5] Neuropathy is "damage to the peripheral nervous system, which transmits information from the brain and spinal cord to every other part of the body." NINDS Peripheral Neuropathy Fact Page, National Institute of Health: National Institute of Neurological Disorders and Stroke, available at http://www.ninds.nih.gov/disorders.peripheralneuropathy/peripheralneuropathy.htm (last visited March 2, 2015).

[6] Dr. Aboelsaad's letter indicates that Mr. Sickler was referred to him by Dr. Darryl DiRisio of the Albany Medical Center. (R. at 342).  The record does not contain any record of Mr. Sickler visiting Dr. DiRisio prior to this consultation.

cervical spine. (R. at 347). It revealed "[s]evere left sided foraminal stenosis from uncovertebral joint[7] hypertrophy at C5-6". (R. at 348).

On June 23, 2011, the plaintiff received his epidural injection. (R. at 338-41, 345-46). Later that day, Mr. Sickler had a follow-up with Dr. Darryl DiRisio to review his recent cervical spine MRI. (R. at 336-37). In a letter addressed to Dr. Wilson, Dr. DiRisio reported that Mr. Sickler was having difficulties with his hands as he was frequently dropping things and was unable button his shirt. (R. at 336). He was also experiencing a fair amount of neck pain. (R. at 336). Dr. DiRisio found Mr. Sickler's intrinsic hand strength to be "okay." (R. at 336). The plaintiff did experience pain while performing a Phalen's type maneuver but had a negative Tinel's sign, coupled with excellent strength in all four extremities and a "perfectly fine" gait. (R. at 336). Dr. DiRisio believed Mr. Sickler's symptoms pointed to Lyme disease as the cause of his pain. (R. at 336-37). Dr. DiRisio's report did not mention Mr. Sickler's recent

---

[7] Uncovertebral joints are small synovial joints formed secondarily between the lateral lips (uncinate processes) of the superior surfaces of the bodies of the lower cervical vertebrae and the inferior surface of the superior vertebral body. Farlex Partner Medical Dictionary (2012), available at http://medical-dictionary.thefreedictionary.com/uncovertebral+joints (last visited April 8, 2015).

epidural or how it might have affected Mr. Sickler's pain or range of motion.   Lastly, Dr. DiRisio stated that he did not feel "operative conditions exist right now until these other issues are sorted out."  (R. at 336-37).

On June 30, 2011, the plaintiff saw Dr. Wilson for a follow-up concerning the results of recent bloodwork.  (R. at 349).  Mr. Sickler again reported significant back pain and stated that the epidural injection was "not helping much."  (R. at 352).  Dr. Wilson diagnosed both cervical and lumbrosacral spinal stenosis and recommended that Mr. Sickler see a neurologist to consider neck surgery.  (R. at 352).

On February 22, 2012, the plaintiff sought assistance for his back pain at Sound Shore Medical Center in Westchester, New York. (R. at 423).  Mr. Sickler was prescribed Fentanyl patches and instructed to follow up regarding his back pain.  (R. at 430).  On February 27, 2012 the plaintiff saw Dr. Cristian Brotea at the Westchester Spine Institute.  (R. at 475).  The plaintiff completed a questionnaire in which he indicated constant back pain that was getting worse and noted "legs give out[;] have fallen".  (R. at 475).  Dr. Brotea's accompanying handwritten notes are illegible. (R. at 477-78).

On March 29, 2012, the plaintiff underwent an MRI on his

lumbar spine.  (R. at 485).  The MRI showed multilevel spinal canal stenosis at levels L1-2 ("mild"), L2-3 ("mild"), L3-4 ("mild to moderate"), and L4-5 ("moderate to marked").  (R. at 486).  Mr. Sickler also had a cervical spine MRI on April 3, 2012.  (R. at 487).  It showed "[n]o significant spinal canal stenosis".  (R. at 487).

On July 12, 2012, the plaintiff was seen by Dr. Eric Mariuma, a neurologist.  (R. at 481).  Dr. Mariuma found that Mr. Sickler's symptoms suggested radiculopathy and noted signs of femoral neuropathy in the left leg with "associated sensory loss and quadriceps weakness".  (R. at 483).  On August 24, 2012, Dr. Mariuma completed a Residual Functional Capacity Questionnaire on behalf of the plaintiff.  (R. at 491).  He opined that Mr. Sickler was incapable of walking a full city block without pain and could not sit or stand for more than ten minutes without having to stand up or move.  (R. at 491).  Dr. Mariuma further indicated that, in an eight-hour workday, Mr. Sickler could sit or stand less than two hours a day, could only walk approximately five to ten minutes at a time, and could only rarely lift less than ten pounds in a work environment.  (R. at 491-92).  Dr. Mariuma noted that Mr. Sickler was constantly in pain and would miss more than four days of work

a month.[8]  (R. at 492).

C. Procedural History

On July 29, 2010, Mr. Sickler applied for disability insurance benefits and supplemental security income, and on June 17, 2011, he filed a second application for a period of disability, disability insurance benefits, and supplemental security income.  (R. at 14). He alleged that his disability began on December 19, 2008.  (R. at 14).  The claims were initially denied on September 21, 2011.  (R. at 14).  The plaintiff submitted a written request for hearing on October 17, 2011. (R. at 14).

The hearing was held by Administrative Law Judge ("ALJ") Katherine Edgell on August 8, 2012.  (R. at 29).  At the hearing, the plaintiff, who was represented by counsel, amended the disability onset date to July 1, 2010.  (R. at 14).  Mr. Sickler testified that he drops things, that his legs give out on him, and that he is unable to tie his own shoes because his pain prevents him from bending down long enough.  (R. at 45).  Mr. Sickler went on to explain that he had moved to New York from South Carolina for financial reasons.  (R. at 47).  Mr. Sickler stated that he and his family had "pretty much ended up homeless", that he could not

---

[8]  This opinion was stated by checking a box on the questionnaire, leaving open the possibility that Dr. Mariuma believed the plaintiff would miss more work than actually stated.

12

receive consistent medical treatment from doctors in South Carolina because he did not have health insurance or the money to pay for his medical treatment out-of-pocket.  (R. at 46-47).

When describing a normal day, the plaintiff stated that his wife helps him shower and get dressed, that he spends his days watching TV and sleeping, and when he does leave the house, it takes him about 45 minutes to get down the stairs.  (R. at 52-53). During the hearing, Mr. Sickler had a cane with him, which he reportedly uses "all the time"; prior to receiving the cane from his physical therapist, he had been using a walking stick for the previous one and one-half to two years.  (R. at 53, 56).

The plaintiff went on to state that he could lift "[m]aybe four pounds," that he could stand for ten minutes, and that he could sit for ten to fifteen minutes.[9]  (R. at 54).  Mr. Sickler stated that his leg is weak and constantly numb, enough so that his doctor was able to "put a needle in about six, eight inches long," without his feeling pain.  (R. at 57).  As a result of his pain and weakness, Mr. Sickler is unable to do any household chores or go grocery shopping and only gets three to four hours of sleep nightly.  (R. at 58, 62).  When Mr. Sickler does reach down to get

---

[9] The transcript of the hearing indicates that Mr. Sickler was frequently switching between sitting and standing due to his pain. (R. at 46).

something, it takes "about seven, ten minutes" to get back up again. (R. at 60).

ALJ Edgell issued a decision on October 23, 2012, finding that the plaintiff was not disabled. (R. at 11-22). The Appeals Council denied Mr. Sickler's request for review of the ALJ's decision (R. at 1-6), rendering the ALJ's determination the final decision of the Commissioner.

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Social Security Act and therefore entitled to disability benefits if he can demonstrate, through medical evidence, that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009); Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000).

The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy."
42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability
benefits, the Commissioner employs a five-step sequential analysis.
20 C.F.R. § 404.1520(a). First, the claimant must demonstrate that
he is not currently engaging in substantial gainful activity. 20
C.F.R. § 404.1520(a)(4)(i), (b). Second, the claimant must prove
that he has a severe impairment that "significantly limits [his]
physical or mental ability to do basic work activities." 20 C.F.R.
§ 404.1520(a)(4)(ii), (c). Third, if the impairment is listed in
Appendix 1 or is the substantial equivalent of a listed impairment,
the claimant is automatically considered disabled. 20 C.F.R. §
404.1520(a)(4)(iii), (d). Fourth, if the claimant is unable to
make the requisite showing under step three, he must prove that he
does not have the residual functional capacity to perform his past
work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). Fifth, if the claimant
satisfies his burden of proof on the first four steps, the burden
shifts to the Commissioner to demonstrate that there is alternative
substantial gainful employment in the national economy that the
claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v), (g);
Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23
(S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77

(2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); accord Martinez-Paulino v. Astrue, No. 11 Civ. 5485, 2012 WL 3564140, at *10 (S.D.N.Y. Aug. 20, 2012).

B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if he establishes that no material facts are in dispute and that he is entitled to judgment as a matter of law.  See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Social Security Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not

16

supported by substantial evidence." <u>Hahn</u>, 2009 WL 1490775, at *6 (internal quotation marks omitted); <u>see also</u> <u>Longbardi</u>, 2009 WL 50140, at *21; <u>Bonet v. Astrue</u>, No. 05 Civ. 2970, 2008 WL 4058705, at *2 (S.D.N.Y. Aug. 22, 2008).

Judicial review, therefore, involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal standard. <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Calvello v. Barnhart</u>, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence.

"In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." <u>Longbardi</u>, 2009 WL 50140, at *21 (citing <u>Brown</u>, 174 F.3d at 62). Substantial evidence in this context is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hahn</u>, 2009 WL 1490775, at *6 (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)); <u>accord</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004).

"If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).

Discussion

A.   ALJ's Decision

ALJ Edgell evaluated Mr. Sickler's claim pursuant to the five-step sequential evaluation process and concluded that Mr. Sickler was not disabled at any time since the alleged onset date.   20 C.F.R. §§ 404.1520(g), 416.920(g); (R. at 21).

As an initial matter, the plaintiff met the insured status requirements of the Act.[10]   At step one, the ALJ found that Mr. Sickler had not engaged in substantial gainful activity since July 1, 2010.  (R. at 17).  At step two, she determined that Mr. Sickler had the following severe impairments: degenerative disc disease, disc bulges, and stenosis of the lumbrosacral and cervical spine;

---

[10] In accordance with sections 216(i) and 223 of the Act, the claimant must acquire sufficient quarters of coverage to qualify for benefits.  The plaintiff is insured through December 31, 2012, and, therefore, meets the requirements.  (R. at 16).

hypertension; alcohol abuse in partial remission; neuropathy; history of Lyme disease; and gout. (R. at 17). At step three, however, the ALJ determined that none of Mr. Sickler's impairments, either individually or in combination, was of a severity to meet or medically equal one of the "listed impairments" in Appendix 1 of the regulations (the "Listings"). (R. at 17).

At step four, the ALJ determined that Mr. Sickler had the residual functional capacity to perform "a broad range of light work" as defined in 20 C.F.R. §§ 404.1567(b) & 416.967(b), and was able to "lift 10 pounds frequently" and "up to 20 pounds on occasion"; sit, stand, and walk for up to six hours each in an eight-hour workday; and "occasionally climb stairs, balance, stoop, kneel, crouch, or crawl." (R. at 17-18). The only limitations noted by the ALJ were that Mr. Sickler could not climb scaffolds or ladders. (R. at 18).

In reaching this conclusion, the ALJ considered the plaintiff's reported symptoms and found that his "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" (R. at 20), but determined that the medical evidence in this case "fail[s] to provide strong support for the claimant's allegations of disabling symptoms and limitations as of the alleged onset date" (R. at 18). The ALJ

found that Mr. Sickler's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible," specifically noting that Mr. Sickler failed to follow physician advice to cease tobacco and alcohol use and that his medical care was "sporadic and conservative". (R. at 20).

The ALJ accorded the opinion of Dr. Liao "great weight" as "consistent with and supported by medical evidence of record". (R. at 21). Dr. Wilson's opinion was considered but "not given great weight" because she opined that Mr. Sickler is "unable to work", a determination that is reserved to the Social Security Administration. (R. at 21). ALJ Edgell accorded Dr. Mariuma's opinion no weight because his residual functional capacity assessment was "contradicted by examiners who saw the claimant during the period on which Dr. Mariuma opined". (R. at 21).

At step five, the ALJ determined that Mr. Sickler was "capable of performing past relevant work as a gas line surveyor." (R. at 21).

The plaintiff challenges the ALJ's decision on the grounds that the ALJ (1) failed to properly consider the plaintiff's impairments against the listing of impairments for the spine, and (2) failed to give controlling weight to the treating physicians in assessing his residual functional capacity.

B.   Substantial Evidence

1.   The Listings

The plaintiff alleges that the ALJ erred in evaluating his impairments under the Listings by failing to sufficiently analyze the medical record and explain the basis for her findings. (Memorandum of Law in Support of Plaintiff's Motion for Judgement on the Pleadings ("Pl. Memo."), at 12); 20 C.F.R. § 404.1520(a)(4)(iii).

When a disability claim is "premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982). Accordingly, where the ALJ's reasoning is opaque, it is appropriate to "remand the case for further findings or a clearer explanation of the decision." Id.

The ALJ is not required to mention every item of testimony presented to her or to explain why she considered particular evidence unpersuasive or insufficient to lead to a finding of disability. Petrie v. Astrue, 412 F. App'x 401, 407 (2d Cir. 2011). Nevertheless, "the hearing officer must set forth the 'crucial factors' of his or her decision 'with sufficient specificity to enable [reviewing courts] to decide whether the

determination is supported by substantial evidence." <u>Wood v.</u> <u>Colvin</u>, 987 F. Supp. 2d 180, 192 (N.D.N.Y. 2013) (alteration in original) (quoting <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)).

Here, the ALJ failed to state with adequate specificity why the plaintiff's impairments did not meet the criteria of any of the listings in Appendix 1.  Her reasoning was both generic and terse: while the decision did enumerate the impairments the ALJ considered when evaluating Mr. Sickler's claim, it did not explain why the symptoms fell short of the listings in Appendix 1 or support her assertion that Mr. Sickler could "ambulate effectively." (R. at 17).  Mere assertions that a claimant's impairments do not meet the severity of specific listings, without more, do not constitute the "specific factual findings" necessary for denying a disability claim.  <u>Wood</u>, 987 F. Supp. 2d at 192-93 (quoting <u>McCallum v.</u> <u>Commissioner of Social Security</u>, 104 F.3d 353, *1 (2d Cir. 1996) (table)).

The plaintiff also alleges that the ALJ erred in finding that he does not meet the requirements of the relevant listings under Appendix 1. (Pl. Memo. at 14); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The "Social Security Act is a remedial statute, to be broadly

construed and liberally applied." <u>Williams v. Bowen</u>, 859 F.2d 255, 260 (2d Cir. 1988)(quoting <u>Gold v. Secretary of Health, Education, and Welfare</u>, 463 F.2d 38, 41 (2d Cir. 1972).

The Listing for the spine requires the claimant to make a showing of the following:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, <u>spinal stenosis</u>, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04.

Spinal stenosis, an impairment under Listing 1.04, is defined

as the narrowing of the lumbar or cervical spinal canal.[11] Stenosis manifests in several variations, including central stenosis (the narrowing of the entire central spinal canal) or foraminal stenosis (the narrowing of the foramen through which the spinal nerve exits the spinal canal).[12]

Mr. Sickler's medical record is replete with diagnoses of spinal stenosis, either specifically as spinal stenosis or as one of the variations listed above. (R. at 283-84, 342-44, 347-48, 393-94, 483, 486-87). The majority of these diagnoses were derived from medically accepted imaging, such as an MRI. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00C1. The MRIs led to a consistent diagnosis of spinal stenosis beginning with Mr. Sickler's first recorded MRI on September 3, 2010, revealing foraminal stenosis (R. at 283-84), through his final recorded MRI in April 2012 showing "significant spinal stenosis". (R. at 487). The record contains considerable evidence indicating spinal stenosis, and the ALJ failed to cite even a "scintilla" of evidence suggesting otherwise. See Hahn, 2009 WL 1490775, at *6.

---

[11] Umshoreregional.org, Spinal Stenosis Overview, available at http://umshoreregional.org/health/medical/reports/images/spinal-s tenosis (last visited March 2, 2015).

[12] Mladen Djurasovic et al., Contemporary Management of Symptomatic Lumbar Spinal Stenosis, 41 Orthop. Clin. N. Am. 183, 185 (2010).

Next, a claimant with a spinal disorder must meet the requirements of either Listing 1.04A, B, or C.  The plaintiff contends that he satisfies 1.04A and C.  (Pl. Memo at 14).

Listing 1.04C requires a showing of "[l]umbar spinal stenosis" resulting in an "inability to ambulate effectively, as defined in 1.00B2b."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04C.  An inability to ambulate means "an extreme limitation of the ability to walk . . . [and] having insufficient lower extremity functioning [] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2b(1).

Effective ambulation means being capable of "sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living [and having] the ability to travel without companion assistance to and from a place of employment or school."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2b(2).  Examples of ineffective ambulation include an "inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory

activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00B2b(2).

Here, the ALJ's determination that the plaintiff fails to meet the criteria of Listing 1.04C is supported by substantial evidence. While Mr. Sickler did testify at his hearing that he had been using a cane and walking stick (R. at 56), the medical record reveals several instances of Mr. Sickler walking without an assistive device.  (R. at 307-08, 342-44, 482).

Listing 1.04A requires "[e]vidence of nerve root compression". 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The record contains several diagnoses of neuropathy and radiculopathy, which is defined as "the result of injury to or compression of the root of a nerve in [the spine] which can result in pain at the end of the nerve where sensation is felt."[13]  (R. at 336, 342-44, 364, 483).  Similarly, the record is rife with references to motor loss accompanied by sensory or reflex loss in the left leg (R. at 342-43, 390, 483), to the left leg frequently giving out (R. at 306, 373, 475), to

---

[13]  Stanfordhealthcare.org, Cervical Radiculopthy/Cervical Myelopathy, available at https:// stanfordhealthcare.org/medical-conditions/back-neck-and-spine/ cervical-radiculopathy-cervical-myelopathy.html (last visited March 2, 2015).

decrease in sensation in the left leg (R. at 336, 482), and to a decreased signal throughout the cervical spine (R. at 487).   There are also several references to positive straight-leg raising tests. (R. at 293, 304, 309, 368-69) and Mr. Sickler's limited range of motion (R. at 304, 386,  390).

Even construing the evidence conservatively, Mr. Sickler has made an adequate showing to meet the requirements of Listings 1.04 and 1.04A.  The ALJ's decision, in contrast, did not cite a single medical record to support her determination that Mr. Sickler's impairments did not qualify under Listing 1.04 and thus is not supported by substantial evidence.

### 2.   Treating Physician Rule

The plaintiff alleges that the ALJ erred by failing to grant controlling weight to his treating physicians, Drs. Wilson and Mariuma.  (Pl. Memo. at 21-24).   The Social Security Act regulations establish that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"   Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)

27

(alteration in original)(quoting 20 C.F.R. § 404.1527(c)(2));[14]
accord <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003);
<u>Correale-Englehart v. Astrue</u>, 687 F. Supp. 2d 396, 426 (S.D.N.Y.
2010). "This preference is generally justified because treating
sources are likely to be 'the medical professionals most able to
provide a detailed, longitudinal picture' of a plaintiff's medical
impairments and offer a unique perspective that the medical tests
and SSA consultants are unable to obtain or communicate."
<u>Correale-Englehart</u>, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. §
416.927(c)(2)).

If the ALJ determines that a treating physician's opinion is
not controlling, she is nevertheless required to consider the
following factors in determining the weight to be given to that
opinion: (1) the length of the treatment relationship and the
frequency of examination; (2) the nature and extent of the
treatment relationship; (3) the evidence provided to support the
treating physician's opinion; (4) the consistency of the opinion
with the record as a whole; (5) whether the opinion is from a
specialist; and (6) other factors brought to the Commissioner's
attention that tend to support or contradict the opinion. 20

---

[14] Prior to March 26, 2012, the treating physician rule
appeared in 20 C.F.R. § 1527(d)(2) and subsequently was moved to 20
C.F.R. § 1527(c)(2).

C.F.R. § 404.1527(c); see Halloran, 362 F.3d at 32.  The ALJ must give "good reasons" for not crediting the treating physician's opinion.  20 C.F.R. § 404.1527(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

Determination of "dispositive" issues, such as whether a claimant "meet[s] the statutory definition of disability" and cannot work, are reserved for the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); see Snell, 177 F.3d at 133.  Thus, the Commissioner considers the data and opinion of the treating physician but draws her own conclusions as to whether the claimant is disabled.  A treating physician's statement that the plaintiff cannot work is not determinative.  See Snell, 177 F.3d at 133.

### i. Dr. Wilson

Here, in concluding that Mr. Sickler could perform light work, the ALJ declined to give controlling weight to Dr. Wilson's opinion conclusion concerning the plaintiff's disabling limitations.  (R. at 17-21).  The ALJ only considered Dr. Wilson's opinion, but did not accord it "great weight."  (R. at 21).

Although ALJ Edgell was not required to give Dr. Wilson's opinion controlling weight, she was obligated to detail her reasons for failing to do so.  20 C.F.R. § 404.1527(c)(2).  "Reserving the ultimate issue of disability to the Commissioner relieves the

Social Security Administration of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited." <u>Snell</u>, 177 F.3d at 134.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even -- and perhaps especially -- when those dispositions are unfavorable. A claimant like [Mr. Sickler], who knows that [his] physician has deemed [him] disabled, might be especially bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied. [Mr. Sickler] is not entitled to have [his physician]'s opinion on the ultimate question of disability be treated as controlling, but [he] is entitled to be told why the Commissioner has decided -- as under appropriate circumstances is his right -- to disagree with [the treating physician].

<u>Id.</u> (internal citation omitted)(remanding case to Appeals Council for statement of reasons on basis of which treating physician's finding of disability was rejected).

Here, the ALJ justified assigning little or no weight to Dr. Wilson's opinion because the ALJ believed it was inconsistent with the medical records on file. (R. at 21). This conclusory statement does not "'comprehensively set forth [the ALJ's] reasons for the weight assigned to [the] treating physician's opinion.'" <u>Burgess</u>, 539 F.3d at 129 (quoting <u>Halloran</u>, 362 F.3d at 33); <u>see also</u> <u>Duncan v. Astrue</u>, No. 09 CV 4462, 2011 WL 1748549, at *18

(E.D.N.Y. May 6, 2011) (explaining that conclusory statements, such as opinion being "not supported by the preponderance of the objective evidence of record" and "not consistent with the evidence on record," are not sufficient reasons for assigning reduced weight to treating physician's opinion).

Although a thorough review of the record might indicate reasons for ALJ Edgell's decision not to assign Dr. Wilson's opinion controlling weight, the requisite "good reasons" must be articulated and "post hoc rationalizations for agency action" are not acceptable.  Newbury v. Astrue, 321 F. App'x 16, 18 (2d Cir. 2009) (internal quotation marks omitted) (holding that court review of decision and record cannot substitute for ALJ's specific delineation of reasons for weight given to treating physician's opinion).

In her decision, ALJ Edgell made generic references to the record as a whole and to a finding by "the neurosurgeon" that the plaintiff's symptoms were likely caused by Lyme disease.  (R. at 21, 336).  The neurosurgeon referred to is likely Dr. DiRisio, as he is the only doctor to diagnose the plaintiff with Lyme disease. Dr. DiRisio's report, however, is of questionable utility.  It reflects his findings after an examination that took place mere hours after Mr. Sickler had received an epidural injection.  (R. at

31

337, 339).   Oddly, Dr. DiRisio's report did not take note of the injection, which could have had a profound effect Mr. Sickler's pain, allowing him greater range of motion and use of his extremities than under normal circumstances.  Because Dr. DiRisio's report neglects this critical information, the ALJ should not have relied on it.

The ALJ's other objection to Dr. Wilson's opinion is that Dr. Wilson made a determination reserved for the Commissioner.  (R. at 21).   Although the ALJ must make the ultimate decision regarding whether a claimant is disabled under the Act, 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1), this does not imply that when a treating physician encroaches on the ALJ's role, the ALJ may disregard other appropriate opinions of that doctor.

Moreover, the ALJ failed to adequately discuss the length, frequency, nature, and extent of Dr. Wilson's relationship with the plaintiff.   See Serrano v. Colvin, No. 12 Civ. 7485, 2014 WL 197677, at *16 (S.D.N.Y. Jan. 17, 2014).   The doctor-patient relationship in this case is clearly sufficient, given the plaintiff's multiple visits, for Dr. Wilson to provide a meaningful diagnosis and "unique perspective" with respect to Mr. Sickler's impairments.  Correale-Engelhart, 687 F. Supp. 2d at 426.

Nor did the ALJ take into account the evidence consistent with

Dr. Wilson's opinion.   There was ample evidence supporting the
conclusion that Mr. Sickler suffers from back pain due to severe
spinal and disc disease.   Nor was there any subsequent diagnostic
evidence to indicate that Mr. Sickler's injury had subsided.
Therefore, the ALJ erred in concluding that the objective medical
evidence did not support Dr. Wilson's opinion.

ii. <u>Dr. Mariuma</u>

The ALJ disregarded Dr. Mariuma's opinion completely on the
ground that his opinion provided "no rational [sic] for the limits
assessed and gives a retrospective opinion that is contradicted by
examiners who saw the claimant during the period on which Dr.
Mariuma opined".   (R. at 21).   Dr. Mariuma concluded that Mr.
Sickler could not walk a full city block without pain and could not
sit or stand more than ten minutes without having to stand up or
move, could only sit or stand less than two hours a day, could only
walk approximately five to ten minutes at a time, and could rarely
lift less than ten pounds in a work environment.   (R. at 491-92).
He found that Mr. Sickler was constantly in pain and would miss
more than four days of work a month.   (R. at 492).   Dr. Mariuma
ultimately concluded that the plaintiff was unable to work.   (R. at
494).

It is unclear why the ALJ disregarded Dr. Mariuma's opinion

for being "retrospective",[15] when the opinion to which she accorded the most weight, Dr. Liao's, was also based on a review of the record. (R. at 21, 314-21).  The only differences between the basis for the two opinions is that Dr. Mariuma examined Mr. Sickler personally and had access to a more complete medical record.

The regulations permit the "opinions of nonexamining sources to override treating sources' opinion provided they are supported by evidence in the record." Diaz v. Shalala, 59 F.3d 307, 313 n. 5 (2d Cir 1995); Bell v. Colvin, No. 7:12 CV 1813, 2015 WL 224662, at *9 (N.D.N.Y. Jan. 15, 2015).  However, "opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians." Simmons v. U.S. Railroad Retirement Board, 982 F.2d 49, 56 (2d Cir. 1992) (quoting Havas v. Bowen, 804 F.2d 783, 786 (2d Cir. 1986)).

Here, the opinion of a non-examining source is not supported by the evidence.  Dr. Liao's opinion that Mr. Sickler could engage in light work finds no support in the record.  Conversely, Dr. Mariuma's opinion that Mr. Sickler is "unable to work and is effectively disabled" (R. at 494), is contradicted solely by the opinion of a non-examining physician.

---

[15] By "retrospective", ALJ Edgell presumably meant that Dr. Mariuma's opinion was based largely, if not completely, on other doctors' prior medical findings.

The other critical difference between the opinions of Drs. Mariuma and Liao is access to medical files. Dr. Liao only had access to medical records up to November 2, 2010, the date of his report. (R. at 321). This would only include four out of the approximately nineteen relevant medical reports in the record. By contrast, Dr. Mariuma's latest opinion is dated April 2013, and so he presumably had access to all preceding medical reports and was able to utilize them in formulating his own opinion. (R. at 493-95). Dr. Mariuma was thus able to base his opinion not only on his own personal observations, but also on the opinions of a greater number of physicians who examined Mr. Sickler. Dr. Liao's opinion was the only record with such an optimistic assessment of Mr. Sickler's capabilities, yet even he found the plaintiff's complaints of enduring pain credible. Both the subjective and diagnostic evidence in the record contradict Dr. Liao's conclusion that Mr. Sickler was capable of performing light work.

The weight assigned by the ALJ to the opinions of Drs. Wilson, Mariuma, and Liao was not in accordance with the treating physician rule. Had the ALJ correctly followed the rule, she would have better articulated her reasoning and assigned the opinions of Mr. Sickler's doctors different weight.

35

C. Credibility

The plaintiff alleges that the ALJ improperly analyzed his credibility and used his activities of daily living against him. (Pl. Memo. at 16, 18).

The ALJ found "the credibility of [Mr. Sickler's] allegations" to be unsupported by the record. (R. at 20). "It is well within the discretion of the Commissioner to evaluate the credibility of a claimant's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent" of the claimant's symptoms. Nunez v. Astrue, No. 11 Civ. 8711, 2013 WL 3753421, at *11 (S.D.N.Y. July 17, 2013).

Here, ALJ Edgell cites Mr. Sickler's self-reported daily activities to rebut the subjective evidence of pain and mobility. (R. at 18). However, the record is replete with evidence demonstrating Mr. Sickler's severe and ongoing pain. (R. at 285, 290, 293, 306, 340, 342, 357, 363, 371, 386, 423, 431, 475). Even the Disability Determination Services report, on which the ALJ based her conclusion that the plaintiff was not disabled, found that Mr. Sickler's complaints of pain were credible. (R. at 316).

In any event, Mr. Sickler's "description of [his] activities and life style does not provide sufficient reason for discrediting [his] subjective statements concerning pain or the extent of [his]

impairment. A claimant need not be an invalid, incapable of performing any daily activities, in order to receive benefits under the [Act]." Polidoro v. Apfel, No. 98 Civ. 2071, 1999 WL 203350, at *8 (S.D.N.Y. April 12, 1999). Further, "[w]hen a disabled person gamely chooses to endure pain in order to pursue [daily activities], it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working." Balsamo v. Chater, 142 F.3d 75, 81-82 (2d Cir. 1998) (quoting Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989)).

The record does provide grounds to question whether the plaintiff was exaggerating the severity of his pain, particularly his claim that it takes him forty-five minutes to climb two flights of stairs (R. at 53) and ten minutes to get up after bending down (R. at 60). Nevertheless, such claims do not authorize the ALJ to ignore objective medical evidence supporting the plaintiff's complaints of pain.

Additionally, the ALJ mischaracterized Mr. Sickler's ability to work and deal with pain by citing his daily activities. The record is rife with evidence demonstrating Mr. Sickler's inability to lift items (R. at 51, 54, 235, 237, 239), to get around (R. at 52-54, 237), and his need for substantial assistance in going

through his activities of daily living (R. at 52, 54, 56, 58-62, 235-44).

The ALJ also cited Mr. Sickler's alcohol and tobacco use as detrimental to his credibility. (R. at 20). While it is true that Mr. Sickler was urged to immediately cease smoking and drinking multiple times, there is nothing in the record suggesting that smoking or drinking caused or had any specific adverse effect on his claimed disabilities. To be sure, the record demonstrates that Mr. Sickler's tobacco use adversely effected his "overall health" (R. at 293, 337), and his alcohol consumption contributed to his episodes of gout (R. at 290). But apart from one cryptic note that the plaintiff's level of smoking was "very bad for the back" (R. at 293), there was no further explanation or evidence of causality between either smoking or drinking and Mr. Sickler's chronic back and leg pain.

Nor did the ALJ make her credibility determination pursuant to the factors prescribed by the regulations to determine claimant credibility. Kane v. Astrue, 942 F. Supp. 2d 301, 313 (E.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)). Specifically, the ALJ mischaracterized Mr. Sickler's daily activities, neglected the duration, frequency, and intensity of the plaintiff's pain, and ignored the type, dosage, and effectiveness of the medication taken

by the plaintiff.   See id.   Nor did the ALJ consider the plaintiff's finances, which would have explained why his care was "sporadic and conservative", why he was unable to obtain more consistent medical care to treat his symptoms, why the plaintiff was essentially homeless, and why he was forced to move from South Carolina to New York.  (R. at 20, 46).

   D.   Remedy

   Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding the case for a rehearing.  Remand for additional factual development is appropriate where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'"  Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)); see also Halloran, 362 F.3d at 33.  In this case, Mr. Sickler's disability is severe enough to meet the impairments described in Listings 1.04 and 1.04A, and thus he is disabled within the meaning of the Act.  I cannot determine from the record the period for which Mr. Sickler is entitled to benefits.  Accordingly, remand to the ALJ for such a determination after proper application of the treating physician rule and additional examination of the record is appropriate.

Conclusion

For the foregoing reasons, the Commissioner's decision denying the plaintiff's application for benefits is reversed and the case is remanded for further proceedings consistent with this decision. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       April 9, 2015

Copies transmitted this date to:

Ida M. Comerford, Esq.
Law Offices of Kenneth Hiller, PLLC
6000 North Bailey Ave
Suite 1A
Amherst, NY 14226

Susan D. Baird, Esq.
Assistant United States Attorney
86 Chambers Street, 3d Floor
New York, NY 10007